***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stephenson and the briefs and arguments of the parties. The appealing parties have not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The parties are properly before the North Carolina Industrial Commission and the Commission has jurisdiction over the parties and the subject matter of the plaintiff's claim.
2. The employer, Triangle Grading Paving, Inc. is an employer as that term is defined by the North Carolina Workers' Compensation Act and subject to the provisions of the Act. Claims against Triangle Grading 
Paving, Inc. are administered by Zurich North America.
3. Plaintiff's medical records and unpaid medical bills are attached to the Pre-Trial Order as Exhibit A and admissible without further proof.
4. Plaintiff's average weekly wage is $330.19.
5. The date of plaintiff's injury was on or about June 15, 2002.
 *********** FINDINGS OF FACT
1. On or about June 15, 2002, plaintiff was working for Triangle Grading Paving in Harnett County, North Carolina.
2. The employer, Triangle Grading Paving, Inc., is in the business of grading and paving road surfaces. At the time of his injury, plaintiff's duties and responsibilities included operating a roller, which was used to compact soil prior to paving the road surface. Plaintiff had not suffered a work related injury with defendant-employer prior to June 15, 2002.
3. On or about June 15, 2002, plaintiff was operating a roller at a job site and acting within the course and scope of his employment with the employer. At that time, a section of the road being worked on by defendant required re-grading because the soil did not meet the applicable standards for compaction. As a result, defendant-employer was required to dig up a section of the road approximately 2-3 feet deep, 5-7 feet wide, and 10-15 feet long. The soil was removed from the designated area, creating a steep decline into the 2-3 foot deep cavity on both ends.
4. In order to re-compact the soil in the designated area, plaintiff was required to drive the roller down into the cavity, proceed across the 10-15 foot long section, and up the steep incline at the end of the 10-15 foot section. After proceeding to the top of the cavity, plaintiff would place the roller in reverse and back down into the cavity, proceed across the 10-15 foot long section, and back up the incline on the other side. When plaintiff proceeded back across the 10-15 foot section, he was operating the roller backwards. Plaintiff testified that as the roller went down into the cavity it would "drop very hard."
5. Plaintiff repeated this process across the width of the cavity. After the roller compacted the soil, dump trucks would proceed into the cavity and dump additional soil, and the plaintiff would repeat the process. Plaintiff repeated this process until the cavity was completely filled in and compacted. The plaintiff repeated this process approximately 60 times or more.
6. The roller that was operated by plaintiff did not have brakes, and as plaintiff would proceed down the steep decline into the cavity and then back up on the other side, the impact would repeatedly jerk plaintiff's upper torso, including his back.
7. The roller being operated by plaintiff had a seat belt, which plaintiff was wearing while operating the roller.
8. The re-grading of the cavity caused plaintiff to operate the roller down the incline, across the cavity, and back up the incline numerous times. This activity caused repeated impact and jarring to plaintiff's back.
9. Plaintiff engaged in the above-described activity for approximately 2 hours.
10. Plaintiff also spent several hours pulling on plastic mats after completing the rolling. This task required plaintiff to get off the roller, bend down and pull the plastic mats over the ground prior to the application of rocks and paving on the surface.
11. During and immediately after performing his work duties on or about June 15, 2002, plaintiff felt discomfort in his lower back, which progressively worsened over the weekend. As a result, plaintiff sought medical treatment on June 18, 2002. Plaintiff described the pain as on his backside just above his hip.
12. At approximately 11:20 a.m. on June 18, 2002, plaintiff contacted the Harnett County EMS, complaining of severe right flank pain. At the hearing, plaintiff identified this pain as located in the lower side of his back
13. On June 18, 2002 at 2:29 p.m., plaintiff was admitted to Moore Regional Hospital, complaining of abrupt onset of right flank pain radiating to his groin, as well as nausea and sweats. The initial diagnosis was renal colic, and he was discharged from the hospital.
14. Plaintiff returned to Moore Regional Hospital and was admitted on June 25, 2002, at approximately 3:37 p.m. At that time, plaintiff complained of persistent right side and flank pain radiating into his abdomen and groin. Plaintiff stated to the treating physician, Dr. Julie Verchick, that on his previous admission on June 18, 2002, he had been diagnosed with "kidney stones," and given Vicoprofen and Phenergan. Dr. Verchick's diagnosis was acute right flank pain and nephrolithiasis. Plaintiff received an ultrasound study, which showed no mass or shadowing calculi, and no hydronephrosis. The impression was a "normal renal ultrasound."
15. On September 24, 2002, plaintiff was re-admitted to Moore Regional Hospital, again complaining of flank pain. He reported to treating physician Dr. Don R. Bahner, Jr. that if he had kidney stones, he had never passed the stone to his knowledge. Based on the prior diagnosis, Dr. Bahner provided plaintiff with a urine strainer, oral pain medication, and referral to an urologist.
16. On September 26, 2002 at approximately 10:10 p.m., plaintiff was again admitted to Moore Regional Hospital complaining of flank pain. The records indicate he had been to the hospital multiple times. During the visit, Dr. Bahner performed an IVP to see if they could finally determine whether plaintiff "truly has renal lithiasis."
17. Plaintiff was again admitted to Moore Regional Hospital on October 7, 2002 complaining of flank pain. Plaintiff was seen by Dr. Jeff Gibbons, whose diagnosis was "left flank pain, etiology uncertain." Dr. Gibbons referred the plaintiff to Dr. Storch, a local urologist.
18. The October 7, 2002 admission, plaintiff received a CT of the pelvis and abdomen, which were both normal.
19. On October 9, 2002, plaintiff was seen by urologist Dr. Sam Storch for evaluation. Dr. Storch's records indicate the plaintiff was complaining of left lower back pain, noting that plaintiff had been in the emergency room for the last three months complaining of back pain. Dr. Storch's records further indicate that the multiple work-ups for kidney stones have been unrevealing. During examination, Dr. Storch noted that plaintiff's "back was notable for significant left lower lumbar paraverterbal spasm" and that plaintiff appeared to have a "lower back injury." As a result, Dr. Storch referred plaintiff to Dr. James Rice of Sandhills Orthopedic and Spine Clinic.
20. On October 10, 2002, plaintiff saw Dr. Randall Mercier for suspected kidney stones.
21. On October 15, 2002, on a referral from Dr. Randall Mercier, plaintiff obtained a CT scan of the lumbar spine which revealed small diffused disc bulge L4-L5 with mild central and foraminal narrowing.
22. On October 24, 2002, plaintiff was seen at the Moore Regional Hospital. Records indicate that plaintiff reported his back pain was initially thought to be due to kidney stones, but has now found out that that is not the case. Following an exam by Dr. Linda Jingle, plaintiff was diagnosed with a lumbar strain.
23. Plaintiff was admitted to Moore Regional Hospital on December 18, 2002, complaining of back pain and pain radiating down both legs. Plaintiff was diagnosed with back pain and released.
24. On February 6, 2003, plaintiff was seen in the emergency room at Moore Regional Hospital complaining of low back pain which he reported he has been having since June of 2002, the left side more than the right. He rated his pain at 10 out of 10 in severity at the time of his visit. Plaintiff was diagnosed with chronic back pain.
25. Plaintiff was seen at Moore Regional Hospital on February 20, 2003, March 24, 2003, and April 3, 2003, all for back pain. In the Emergency Physician's Report dated April 3, 2003, plaintiff indicated he had back pain and had had the problem "since last summer." He related his back pain to a work-related injury. Dr. Bahner diagnosed the plaintiff with acute exacerbation of chronic back pain.
26. Plaintiff was seen at the Moore Regional Hospital emergency room on June 10, 2003, complaining of lower back pain. Plaintiff was discharged with a diagnosis of backache and sciatica due to a displacement of an introvertabal disc.
27. Plaintiff testified that his repeated visits to the emergency room at Moore Regional Hospital were necessitated because he had no funds to see a physician, and because his case was denied, could not get the workers' compensation carrier to pay for a visit. At the suggestion of plaintiff's counsel, who was aware that orthopedic surgeon Dr. Edward Mulcahy would see patients without a down payment, plaintiff scheduled an appointment to see Dr. Mulcahy on August 28, 2003. At that visit, plaintiff complained of left low back pain with activity and stated that the pain radiated down the posterior aspect of his left leg and calf, and into his foot. The report further states that plaintiff had no previous history of any back pain, injury, or treatment prior to his compensable injury. Dr. Mulcahy diagnosed plaintiff with "probable RID left lumbar spine, with sciatica." Dr. Mulcahy also opined that the left low back injury is consistent with, and more likely than not, causally related to his work-related injury suffered in June of 2002.
28. Plaintiff again saw Dr. Mulcahy on September 11, 2003, at which time Dr. Mulcahy arranged for an MRI of his lumbar spine at Moore Regional Hospital. Plaintiff saw Dr. Mulcahy on September 30, 2003. Dr. Mulcahy reviewed the MRI results, which showed mild desiccation of the L4-L5 disc and a slight bulging at that disc without neural impingement. Dr. Mulcahy opined that the plaintiff did have permanent injury with some permanent loss of function because of his disc injury. Dr. Mulcahy discharged plaintiff at that time because he did not feel there was anything further he could do for plaintiff.
29. On February 9, 2004, the deposition of Dr. Edward R. Mulcahy was taken in Pinehurst, North Carolina. Dr. Mulcahy is a licensed orthopedic surgeon in the State of North Carolina, attended undergraduate school at Boston College and medical school at the University of Vermont. He served a surgical internship and residency at Boston City Hospital, followed by an orthopedic residency at Tufts University, which concluded in 1969. Dr. Mulcahy has had experience treating patients with back injuries and has done surgery on the lumbar spine. Dr. Mulcahy currently practices in association with Dr. Ciliberto in Sanford, North Carolina. Without objection, Dr. Mulcahy was tendered and accepted as an expert in the field of orthopedics and orthopedic surgery.
30. According to Dr. Mulcahy, it was his understanding that the roller driven by plaintiff was a vehicle he was driving at the time of the injury, and that plaintiff was going down into a hole and back up again, jerking his spine. Dr. Mulcahy reviewed the medical records and concurred that plaintiff's initial diagnosis was kidney stone, and that it was not until approximately four months after the injury that plaintiff's physicians began to focus on a possible low back injury rather than kidney problem.
31. Based upon Dr. Mulcahy's view of the records and discussions with plaintiff, his injury in June of 2002 would be the first evidence of any damage to his low back, and he did not report any previous back injuries. Dr. Mulcahy testified that his diagnosis on August 23, 2003 was a ruptured intravertable disc of the left lumbar spine with sciatica. Dr. Mulcahy's opinion is that the low back injury is consistent with and more likely than not causally related to the injury described at work in June of 2002. The basis for Dr. Mulcahy's opinion is the fact that plaintiff did not have any previous back trouble, the symptoms plaintiff was suffering from were consistent with a low back injury, and plaintiff's persistent pain was also consistent with a low back disc injury.
32. Dr. Mulcahy testified that the MRI taken of the plaintiff showed a disc bulge in plaintiff's lower back at L4-L5, but without nerve root impingement. Dr. Mulcahy explained that when an MRI is taken, the individuals are in a supine lying face-up on a table. Dr. Mulcahy also explained it is possible that an individual can have a bulging disc and experience periodic root pressure or impingement in certain positions, but that when lying supine on a table, having an MRI taken, there will be no definite evidence of such impingement. Dr. Mulcahy explained that this is the disadvantage of an MRI because it is a "static test" and when a "person's up and bending and moving and twisting, the disc bulges, not necessarily a small bulge, it can bulge out further with activity and press on the nerves."
33. Dr. Mulcahy could think of no other explanation for plaintiff suffering or experiencing sciatica, tingling and numbness down his buttocks and legs unless there was some type of nerve root impingement.
34. Dr. Mulcahy also based his opinion on causation on the activities in which plaintiff engaged in June of 2002, as described to him by plaintiff. Dr. Mulcahy opined that plaintiff has a 5% loss of function of the whole body, due to the disc injury or, in the alternative, a 25% loss of function to his low back alone.
35. Plaintiff attempted to return to work during the week of June 17, 2002, but could not perform his job duties due to pain and discomfort in his lower back. Plaintiff has not returned to work since the week of June 17, 2002.
36. Defendant-employer informed plaintiff not to return to work until he could perform a full shift. Plaintiff cannot work a full shift, and has not been physically able to work a full shift since on or about June 15, 2002. Defendant-employer has not offered plaintiff light duty.
37. Prior to plaintiff's injury on or about June 15, 2002, plaintiff had never been treated for low back pain or low back problems.
38. The greater weight of the evidence is that plaintiff sustained a compensable injury to his back on 15 June 2002.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On June 15, 2002 plaintiff suffered a compensable accident arising out of and in the course of his employment with defendant-employer. N.C. Gen. Stat. § 97-2(6).
2. As a result of his compensable injury, plaintiff is entitled to temporary total disability at his compensation rate of $220.14 per week from 26 June 2002 and continuing until plaintiff returns to work or until further Order of the Commission. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to have defendants pay all medical expenses incurred by plaintiff as a result of his compensation injury for so long as such examination, evaluations, and treatments may reasonably be required to effect a cure, give relief or lessen plaintiff's period of disability N.C. Gen. Stat. §§ 97-2(19), 97-25, 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee herein approved, the defendants shall pay to plaintiff temporary total disability at his compensation rate of $220.14 per week from 26 June 2002 and continuing until plaintiff returns to work or until further Order of the Commission. Those amounts which have accrued shall be payable in a lump sum.
2. A reasonable attorney's fee of twenty-five percent (25%) of the lump sum compensation awarded plaintiff in Paragraph 1 of this AWARD is hereby approved to be deducted from sums due plaintiff and paid directly to plaintiff's counsel. Thereafter, every fourth compensation check shall be payable directly to plaintiff's counsel.
3. Defendants shall pay all medical expenses incurred by plaintiff as a result of his compensable injury on June 15, 2002 when bills for same shall have been submitted to the Industrial Commission according to approved Industrial Commission procedure.
4. Defendants shall pay the costs.
This the 27TH day of April 2005.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/________________ BERNADINE BALLANCE COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER
DCS/mb